*Judgment for the defendant.*

## JOHN REED *vs.* CALEB GOSS & others.

A, the owner of a mill upon a natural stream of water, and B, the owner of a mill upon a canal which led therefrom and was supplied by a dam at a point above A's mill, submitted their respective claims to the use of the water to arbitration. There was no waste way at B's mill, but the waste water passed over the dam across the main stream, and down the natural channel thereof, to A's mill. The award was that A has " the right to all the waste water over and above what shall pass to B's mill, through the canal there dug, for the purpose of conveying the water to his mill." *Held*, that under this award A had the right to all the water of the stream except such as was necessary for the reasonable and proper operation of B's mill.

TORT. The first count in the declaration was for the disturbance of a water privilege, by barring the wheel and raising the gate of a mill formerly owned by Abram Washburn, and now occupied by the defendants, which was situated upon a canal leading from the stream upon which the plaintiff's mill stood, and at a point above the same, and thus wantonly causing the water to run to waste. At the trial in the superior court, upon facts which are stated in the opinion, *Lord*, J. ruled that on this count the plaintiff could not recover, and ordered judgment thereon for the defendants. The plaintiff alleged exceptions.

*E. Ames*, for the plaintiff.

*J. White*, for the defendants.

BIGELOW, C. J. The question to be determined in this case arises on the construction to be given to the second article of an award of arbitrators, made in the year 1846, under a rule of court in an action which was then pending between Abram Washburn as plaintiff, and John Reed, the present plaintiff, as defendant. That article is as follows : " That Reed has the right to all the waste water over and above what shall pass to

Washburn's mill through the canal there dug for the purpose of conveying the water to his mill." To interpret this language correctly, it is necessary to take into view the relative situation of the mills of the respective parties at the time the award was made, the subject matter of the suit which was submitted to the arbitrators, and the nature and extent of the authority under which they acted in making the award.

The situation of the mill owned by the plaintiff and that which is now occupied by the defendants is somewhat peculiar. The former is erected on the natural course of a stream called Beaver Brook, at a considerable distance below a dam which is built for the purpose of raising a head of water which passes through the canal leading to the mill occupied by the defendants. This trench or canal is upwards of one hundred rods in length, extending from the dam nearly parallel with the natural stream to a point where it reënters the brook below. About midway of this canal is the mill of the defendants, near which there is another dam, called the lower dam. To this mill there is no waste way by which any surplus water can be carried off, but all the water which does not pass through its gates and flumes flows over the upper dam, down the natural channel of the brook, to the mill of the plaintiff. Such was substantially the relative position of the mills in the year 1844, when the owner of the mill now in possession of the defendants commenced an action against the present plaintiff, in which it was alleged that he had cut down and removed the two dams above described, and thereby diverted the water from the mill situated on the canal. This action was referred to arbitrators, "with power to determine all matters and things which are in dispute between the parties, and make such special award as they may think necessary respecting the regulation of the water and the height to which the plaintiff, his heirs and assigns, may forever hereafter have the right to erect and maintain his mill-dam, stop water in his canal and dam and wasteway above said canal, without violating the rights of the defendant, and to fix such permanent marks or monuments in or near the premises as they may think necessary to define the legal rights of the parties, and

prevent disputes between them." From· this statement it is apparent that the entire water power or privilege of the brook or stream belonged to the owners of the two mills as appurtenant thereto ; that there were differences between them concerning the extent of their respective rights to the use and benefit of the water ; that the object of the reference was to terminate these disputes, and to settle, define and regulate the use of the water between them forever, and that ample power and authority was conferred on the arbitrators to make an award which should accomplish these purposes.

It is obvious by the language used in the second article, that the intent of the arbitrators was to fix and define the extent of the power or privilege which was appurtenant to the plaintiff's mill, and that it was regarded by them as a secondary right, subordinate to that which belonged to the mill now occupied by the defendants. By awarding to the plaintiff only a " right to the waste water over and above what shall pass to Washburn's mill," it is clear that the latter had the first and superior right to the water, and that the former had only a surplus privilege, or right to enjoy the use of the water after Washburn's mill was fully supplied. To ascertain and regulate the use of the water between the two mills, it was absolutely necessary to fix and define the limit of the first privilege. Until that was supplied, the other mill could take nothing. The extent of the second privilege therefore depended on the right of water which belonged to the first. When, therefore, the arbitrators awarded to the plaintiff the right to the waste or surplus water over and above that which passed to Washburn's mill, they intended to establish a measure of the quantity of water which should be appurtenant to each mill. Inasmuch as the mill now occupied by the defendants had no waste way, all the water which was not drawn through its flumes and gateways, for the purpose of operating and driving its wheels and machinery, would necessarily flow over the upper dam and down the natural course of the stream to the plaintiff's mill. The result would therefore be, that all the water which was not essential to the full and effective operation of the mill entitled to the first right would

pass and belong to the mill to which the second or surplus right of water was appurtenant. By this means a standard was created by which to regulate the use of the water of the stream, and divide it between the owners of the two mills in whom the entire water privilege of the brook was vested. The owner of the mill occupied by the defendants would, under the award, be entitled to draw and use so much of the water as was necessary to the reasonable and proper operation of his mill, and the residue would belong to the plaintiff's mill. Any other construction of the language of the award would defeat the chief object which was intended to be effected by it. It would leave the plaintiff's mill without any defined or regulated right to the use of the surplus water. If the owners of the first right could draw all the water which would flow through the canal, without reference to the quantity which was essential to drive his wheels and machinery, the right and privilege appurtenant to the plaintiff's mill would be substantially under the control of the owner of the first right of water. Except in seasons of freshets, or when the stream was full, little or no water would flow over the upper dam, if it could be drawn through the canal without limit or restriction. We cannot think that the arbitrators intended to say that the plaintiff's right was only a privilege to the waste water which did not flow through the canal. Such an interpretation of the language used by them in the second article would make it inoperative and useless. It would leave the plaintiff with no right except to use such amount of water as the owner of the defendants' mill from time to time allowed to run to waste. This would afford no standard by which to measure or regulate the rights of the respective owners. Looking at the object which the arbitrators had in view under the submission, it is manifest that their intent was to establish, as the measure of the right appurtenant to Washburn's mill, such an amount of water as was necessary, by a reasonable and proper use, to drive the wheels and carry the machinery which were then in operation, or their equivalent if the mill should be thereafter appropriated to other purposes, and that the residue of the water should belong to the mill of the plaintiff.

It was suggested in behalf of the defendants, that as no obligation was imposed by the award on the owner of Washburn's mill to keep the lower dam at the same level with the upper one, he might at any time, by diminishing the height of the former, draw down the pond so that the water would pass through the canal, and would be prevented from flowing over the upper dam to the plaintiff's mill. But this suggestion furnishes no valid argument in favor of the construction of the award for which the defendants contend. It leaves out of view the great and leading fact on which the action of the arbitrators was based, that there was no waste way to Washburn's mill, and that no water could pass through the canal into the stream below the plaintiff's mill except such as passed through the gates and sluices which were opened when the mill occupied by the defendants was in operation. Besides; it could not reasonably be supposed that the owner of Washburn's mill would ever diminish the head of water which constituted a valuable part of his privilege, by lowering the height of the dam at his mill. On the contrary, the arbitrators clearly proceeded, in making their award, on the idea that both dams would be kept up to the height to which it was determined by them the owner of Washburn's mill had a right to maintain them. Indeed, the subject matter of the suit which was referred to their decision was the alleged tortious acts of the present plaintiff in taking down portions of these very dams. It is therefore quite clear, that in dividing the water between the two mills they assumed, as the basis of their action, that the water would be kept at a uniform height by the two dams as prescribed in the first and third articles of their award.

It follows from these views of the respective rights of the parties as established by the arbitrators, that the defendants had no right to draw more water at their mill, through its gates and sluiceways, than was sufficient to operate their mill, with wheels and machinery requiring a power equal to that which was used at the mill at the time the award was made, and that if they have diverted more water from the natural stream than was necessary for this purpose, or have used it in an improper or

unreasonable manner, to the injury of the plaintiff's right to the waste or surplus water, they are liable in this action. *Barrett* v. *Parsons*, 10 Cush. 367.          *Exceptions sustained.*